

FILED
in the Middle District of
North Carolina

February 22, 2021
6:05 pm

Clerk, US District Court
By: _____ kg _____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOSEPH EARL CLARK, II,                     )
                                           )
            Plaintiff,                     )
                                           )
      v.                                   )            1:18CV493
                                           )
SHAWN LINDSEY BRITT, et al.,               )
                                           )
            Defendants.                    )

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This is a *pro se* civil rights action filed under 42 U.S.C. § 1983 by Plaintiff Joseph Earl Clark, II, an inmate in the North Carolina Department of Correction. The Complaint [Doc. #2] relates to events which occurred at Scotland Correctional Institution beginning on June 14, 2016, and which led to both prison disciplinary charges and state court criminal charges against Plaintiff. He was found guilty of the disciplinary charges, but the criminal charges were later dismissed by the State. Plaintiff subsequently filed an unsuccessful petition for habeas corpus in this Court challenging the prison disciplinary convictions in case 1:17CV47. After the Court granted summary judgment in favor of the Respondent in that case, Plaintiff filed the current action naming fourteen current and former prison officials as Defendants. A number of motions filed by the Parties, including cross motions for summary judgment, are currently pending before the Court and will be discussed in turn below.

I. Allegations and Facts

A. Allegations in the Complaint

The Complaint alleges generally that Defendants violated Plaintiff's right to due process, his right to be free from cruel and unusual punishment, and his right to equal protection of the laws. He also alleges state law claims for malicious prosecution, obstruction of justice, and violations of N.C. Gen. Stat. § 15A-268(a1), (a5), and (a7). The Complaint states that on June 21, 2016, Defendants Monica Almodovar and Shawn Britt falsified events that led to Plaintiff's disciplinary convictions and criminal prosecution because he had filed multiple grievances and a prior lawsuit. (Complaint at 7-8.)[1] Defendant Almodovar, a case manager at Scotland Correctional, allegedly gave a statement to the Scotland County Sheriff's Office that Plaintiff "came into her cubicle on camera and began ejaculating semen all over her office, her hand, her desk, and on [himself] in large amounts." (Complaint at 8.) Defendant Britt allegedly gave a statement that he saw semen on Plaintiff's clothes. (Complaint at 9.) The Complaint states that the Scotland County Sheriff's Department attempted to gain access to evidence, including video footage, photographs taken of Plaintiff by Defendant Zerranti McClean, and the clothes Plaintiff wore the day of the incident, but that Defendants did not turn over that evidence despite Plaintiff filing grievances asking them to do so. (Id.) It accuses Defendants Reginald Mewborn and Elizabeth Wallace of "rubber stamping" the grievances and dismissing them. (Id.) Prison officials eventually transferred Plaintiff to a prison three hours away, which he alleges separated him from his attorney in the

---

[1] All page citations to documents in the record refer to the page numbers listed in the footer displayed on the documents in this Court's electronic case filing database.

2

criminal case. The Complaint alleges that Defendant Almodovar told the Sheriff's Office that Defendant Katy Poole had watched video of the incident, but that Defendant Poole also would not turn over the video. (Complaint at 10.) Plaintiff's attorney in the criminal case filed a motion to dismiss the criminal charges and the District Attorney filed a dismissal after learning that all of the evidence had been destroyed, allegedly in violation of North Carolina statutory law and prison regulations.

As noted above, the prison also conducted disciplinary proceedings. The Complaint claims that Defendants Justin Chavis and Britt conducted the disciplinary investigation and that Defendant Pamela Locklear was the hearing officer. (Id. at 8.) Defendants Jamie Hammonds and Toya Collins conducted an administrative investigation, which Defendants Ronald Covington and Dean Lochlear reviewed. (Id. at 9.) Defendant Queen Gerald allegedly participated in the disciplinary process and reviewed the video in question. (Id. at 11.) Plaintiff filed the previously mentioned habeas action challenging his conviction on the disciplinary charges, but lost that case, which he contends was because he did not have the evidence to prove bias on the part of the hearing officer. (Id.)

Based on these allegations, Plaintiff claims that he suffered distress due to facing a possible four additional years in prison and a loss of family ties. He seeks compensatory and punitive damages and the expungement of the dismissed criminal charges from his record. (Id. at 12.)

## B. Allegations in the Amended Complaint and Supplement

Plaintiff also filed an Amended Complaint [Doc. #3] and Supplement [Doc. #4] which repeat many of the allegations set out above and make additional allegations and claims. The Amended Complaint alleges that on June 14, 2016, Defendant Almodovar reported to Defendant Britt that Plaintiff entered her cubicle and exposed himself while on camera. (Amended Complaint at 8.) Defendant Selena Bartee responded to the call and ordered other officers to escort Plaintiff to solitary confinement. (Id.) Defendant Britt then came to solitary confinement and ordered Plaintiff into his office, where he threatened to "beat [Plaintiff's] a\*\*" because he was tired of Plaintiff being written up for exposing himself to female staff.[2] (Id.) Plaintiff responded that he was "'not trying to hear that'" because he was on medium custody and "'the most [Britt could] do is write [Plaintiff] up for a B6 and give [him] 30 days in the 'hole' [and Plaintiff would] still be medium custody when [he] get[s] out of the hole.'" (Id. at 9.) This allegedly angered Defendant Britt, who then said he would make sure that Plaintiff got an assault charge this time and was demoted to close custody, that he knew Plaintiff beat an assault charge at another prison, and that Plaintiff would regret this day. (Id.) The Amended Complaint alleges that Defendant McClean came to solitary about an hour later and took pictures of Plaintiff and his pants on Britt's orders. (Id.) The Amended Complaint alleges that Plaintiff was then stripped naked and left in solitary confinement for three days with the temperature turned down and was denied a typical medical screening for inmates

---

[2] The records of the North Carolina Department of Public Safety reveal that, prior to the incident in this case, Plaintiff had 15 disciplinary convictions for committing sexual acts, 17 convictions for disobeying staff, 7 convictions for assaulting, threatening to assault, or interfering with staff, and various other offenses.

4

placed in solitary confinement. (Id.) The Amended Complaint also states that officials also failed to tell Plaintiff's mother not to come for a scheduled visit, causing her to come to the prison only to be turned away by Defendant Covington. (Id.)

The Amended Complaint then reports that on June 21, 2016, Defendants Covington and Dean Lochlear were present when Plaintiff was escorted in shackles and restraints to be taken to the Scotland County magistrate's office. (Id.) As Plaintiff left, Defendant Covington allegedly joked that Plaintiff had "'messed' with the wrong staff." (Id. at 10.) The Scotland County Sheriff's Department booked Plaintiff and charged him with malicious conduct by a prisoner based on a statement by Defendant Almodovar that Plaintiff ejaculated on her and her cubicle. (Id.) The Amended Complaint states that she knew this to be a false statement at the time she made it. (Id.) The Amended Complaint alleges that Defendant Collins gathered evidence in the administrative investigation to give to the Sheriff, but left out photographs, medical documents, and video footage. (Id.) Defendants Covington and Lochlear allegedly approved that report knowing that the evidence was missing. (Id.)

On July 1, 2016, Plaintiff requested video footage at a prison disciplinary hearing. Defendant Locklear was the presiding hearing officer and stated that she looked at the video footage. When Plaintiff informed her he needed the video for his criminal case, she allegedly "tried to downplay the exculpatory value of [the] video." (Id.) She also stated that Defendant Britt had control of the video. (Id.) On August 8, 2016, Defendant Almodovar gave another statement to the Sheriff's Department in which she stated that Defendant Poole had seen the video, that she left her cubicle to seek medical attention for her hand, and that another inmate came in and cleaned her desk and chair. (Id. at 10-11.) Plaintiff was subsequently indicted

5

not only for malicious conduct by a prisoner, but also assault on a female and indecent exposure. (Id. at 11.) Both the prosecuting authorities and Plaintiff's criminal defense attorney attempted without success to obtain the missing video and photographs. (Id.) Defendant Poole then made a statement that the video had been destroyed. (Id. at 11-12.) The Amended Complaint claims that this occurred after Defendants Wallace and Mewborn were "deliberately indifferent" and dismissed Plaintiff's grievances seeking to secure the video evidence. (Id. at 12.) A few weeks later, the charges against Plaintiff were dismissed. (Id.)

Plaintiff claims in the Amended Complaint that he was "devastated and heart broken" when the charges were dismissed because he could not go to trial and prove his innocence. (Id.) This left prison staff and other prisoners talking about the incident and spreading rumors. (Id.) He claims that the dismissal was not favorable to him because he was found guilty in the prison disciplinary hearing, was still punished even though he was innocent, and lost his only opportunity to prove his innocence. (Id. at 13.) He also claims that prison officials failed to conduct an investigation under the Prison Rape Elimination Act of 2003 (PREA), leaving Plaintiff with no further remedy or method to prove his innocence. (Id.) He claims that this causes "emotional distress, humiliation, and hardship on [him] and [his] family." (Id.)

The Amended Complaint also adds a few new or more specific allegations as to particular Defendants. Of note, it alleges that Defendant Britt refused to turn the video evidence over to the Sheriff's Department and wrote a false statement that he saw semen on Plaintiff's pants. (Id. at 14.) It additionally contends that Defendant Britt "planned the whole false incident, coercing [Defendant] Almodovar to go along." (Id. at 14-15.) As to Defendant Poole, it claims that she heads the entire prison, ignored letters for help written by Plaintiff,

reviewed the video of the incident, and allowed the video to be used in the prison disciplinary hearing, but assisted in covering up the video in the criminal proceedings. (Id. at 15.) The Amended Complaint also accuses Defendant Zerranti McClean of refusing to speak out or cooperate in support of Plaintiff and attempts to hold Defendants Hammonds, Bartee, and Gerald liable because they "were the supervisors of the unit where the incident occurred," supervised Defendant Almodovar, and were aware of the incident. (Id. at 16.)

Based on these allegations, Plaintiff contends that Defendants violated his rights under the Fourth Amendment of the United States Constitution, denied his right to due process, engaged in deliberate indifference and cruel and unusual punishment, and committed the state law torts of malicious prosecution, obstruction of justice, and intentional infliction of emotional distress. (Id. at 8.) He seeks compensatory and punitive damages of $200,000. (Id. at 17.)

Plaintiff re-states these claims and repeats these allegations in his unsworn Supplement [Doc. #4]. In the Supplement, he sets out his claims for malicious prosecution in violation of the Fourth Amendment and state law, as well as violation of the Eighth, Fifth, Sixth, and Fourteenth Amendments, against Defendant Almodovar based on her filing a complaint with the Scotland County Sheriff's Department that resulted in the criminal charges. As to the remaining Defendants, the Supplement alleges generally that they failed to protect the evidence, particularly the videos and photographs, and failed to provide the evidence to the Scotland County Sheriff's Department during the criminal proceedings against him. Plaintiff also again raises claims regarding the prison disciplinary proceeding, particularly the loss of

gain time and demotion in custody, and asserts a First Amendment claim for denial of access

to the courts and a claim under the Prison Rape Elimination Act.

## C. Prior Litigation

As noted earlier, before filing the current litigation Plaintiff previously sought a writ of

habeas corpus challenging prison disciplinary convictions related to the same events involved

in the present litigation.  In that case, Plaintiff raised the substance of many of the claims he

raises in the current action, including claims that he did not receive exculpatory evidence, that

he did not receive due process, that his right to equal protection was violated, that he was

innocent of the charges, and that prison officials hid or destroyed evidence.  He lost those

claims on their merits.  However, of particular pertinence to the present case, Plaintiff gave a

statement to prison officials stating that:

> On June 14, 2016 Officer Morse informed me that Ms. Almodovar, who is not
> my case manager, called to see me in her office[.]  I came to her office alone, it
> was only me and Ms. Almodovar.  As I sat in the chair on the other side of her
> desk she informed me that she wanted to talk to me.  As she talked, I asked why
> she is calling me to her office alone and I'm not on her case load, she ignored
> me.  I stood up to leave and she told me to sit back down.  I began to sit back
> down, but continued to question her[.]  She became upset and started yelling[.]
> I began to tell her that she is tripping and went to get up and leave when I
> notced [sic] as I was standing, that one of my button[s] o[n] my pants was
> unbuttoned[.]  I buttoned my button and stood to leave when Ms. Almodovar
> told me to submit to handcuffs[.]  I asked why and she told me to turn around
> to put handcuffs on[.]  I complied allowing her to place the handcuff on my left
> wrist.  She called into another office for case manager Bokens to radio for staff.
> Staff came and escorted me out[.]  At no time did I violate any inmate conduct
> code[.]  At no time did I perform any sexual act.

(Case 1:17CV47, Summary Judgment Brief [Doc. #6], Ex. 1.)  Petition submitted this

statement while signing that he read it and "affirm[ed] that it [was] based on personal

observation of the events described and that it [was] to the best of [his] knowledge a true and

8

accurate statement of fact." Id. So far as the Court is aware, at no point during the prison proceedings, prior litigation, or early parts of the current litigation, did Plaintiff ever disavow this statement or attempt to contradict it.

In that habeas case, the Court ultimately held that Plaintiff could not meet the very narrow standards for challenging a prison disciplinary action in a federal habeas proceeding. Clark v. Hooks, No. 1:17CV47 (M.D.N.C. Aug. 9, 2017), recommendation adopted, Order and Judgment (M.D.N.C. Sept. 20, 2017). Plaintiff did not appeal that decision.

### D. Plaintiff's Declaration

Plaintiff filed a Declaration [Doc. #99] in this case in which, for the first time, he sets out a very different set of facts regarding the events that occurred on June 14, 2016. This statement is flatly at odds with the signed statement he gave to prison officials and, viewed in context of that previously uncontradicted statement, also at odds with his apparent positions in the earlier habeas case and his Complaint and Amended Complaint in this case. According to that Declaration, Plaintiff had never met Defendant Almodovar before, but he had seen her in the halls at times and "flirted" with her whenever he did. (Declaration, ¶ 17.) On the date in question, she had just recently become his case manager and he did not know until that day when was called to her office for the first time. (Id. ¶ 14.) He was "surprised, but glad" when Defendant Almodovar opened the door because she was new to the prison, but there was already a "rumor among the prisoners" that she was "a freak" who "liked to see 'the wood,'" i.e., the male prisoners' "genitals/private part." (Id. ¶ 16, ¶ 18.) Plaintiff heard from other prisoners that when sitting in the chair in her office, a prisoner could expose himself to Defendant Almodovar without being seen on camera. (Id. ¶¶ 20-21.) According to Plaintiff,

9

the fact that he is incarcerated, under the authority of the women he meets, and "deprived of any intimacy with a woman" makes him unable "to resist women['s] sexual advances" so that "any type of flirtatious attention" becomes "irresistible." (Id. ¶ 19.)

When Defendant Almodovar answered the door and asked him into her office, Plaintiff began "flirting" with her and claims that she flirted in return by commenting on his height. This caused Plaintiff to decide to "prepare his pants just in case she really did want to see the wood." (Id. ¶ 24.) Plaintiff had no problem exposing himself to her because, according to Plaintiff, "[m]ost female officials at male prisons" want the male prisoners to expose themselves or make sexual advances, and they "only discipline a male prisoner for showing them the wood as a decoy to keep male staff members from breathing down their back" or suspecting that they like having male prisoners expose themselves. (Id.) Having "prepared" his pants by unbuttoning them, Plaintiff located the blind spot of the surveillance camera, sat in the chair in Defendant Almodovar's office, and positioned his legs so that his pants opened and revealed his underwear. (Id. ¶¶ 25-26.) Plaintiff states that Defendant Almodovar looked at his crotch and turned away to her computer while he asked her questions about his gain time credits. (Id. ¶ 29.) He claims that she looked at his crotch every time he talked, but looked away to her computer when she answered questions, so he began to talk more and become aroused.

In Petitioner's words,

> The wood had rapidly grown, as she watched, pushing up beneath my white boxers, opening my pants wider on its own as it rose out of the pants, sticking up far above my opened pants but still beneath the boxers. Almodovar's eyes locked in on the large white protruding imprint of the wood. She didn't look away at all now, even when she responded she didn't look away. My heart beat sped up as I watched her stare at my wood's imprint.

> The wood began to throb. I never touched the wood. I just let it stand there
> soaking in all her attention while I rapidly fired questions with no desire for a
> legitimate answer. Almodovar began biting her bottom lip. Then, as if snapping
> out of a daze Almodovar looked away and reached for her notepad while telling
> me to hold on and let her write down all of my questions.

(Id. ¶¶ 31-32.)

At this point, another prisoner passed by leaving the cubicle behind Defendant Almodovar's cubicle and exited through the main door. (Id. ¶ 34.) Plaintiff claims this caused Defendant Almodovar to panic, jump up, and tell Plaintiff to submit to handcuffs. (Id. ¶ 35.) Plaintiff stood up, fixed his pants, and told her there was a misunderstanding, but Defendant Almodovar continued to insist that Plaintiff submit to handcuffs. (Id. ¶ 36.) When another case manager, Shannon Boykin, entered the cubicle and asked what was happening, Defendant Almodovar asked her to radio for backup because her radio was on the desk and she already had one handcuff on Plaintiff. (Id. ¶ 38.) At that point, a third case manager entered and Defendant Almodovar stated that Plaintiff had showed her his penis and would not submit to handcuffs. (Id. ¶ 40.) The other case manager then assisted in handcuffing Plaintiff, who submitted at that point. (Id.) Plaintiff describes the encounter this way:

> Since Almodovar had insisted on putting the handcuffs on I turned around and
> she placed my left wrist in the handcuff. . . . Almodovar was visibly nervous. I
> turned back around before Almodovar had handcuffed my right wrist, and
> asked her to just calm down and that there was a misunderstanding. At 6'4"
> and 240 pounds I could have overpowered and harmed Almodovar easily, there
> was no back up, no one knew what was going on, and the only other person
> was another female official who was new and uncertified; but that was not my
> attempt or intention.

> Almodovar then told me to turn back around and submit to the handcuffs,
> voice louder, shaking now. At that time Shannon Boykin came out of her
> cubicle and asked what is going on. Boykin never tried to assist with
> handcuffing me. I told Boykin that Almodovar was overreacting. Almodovar

> told Boykin to use her radio to call for backup, because Almodovar's radio was still on the desk and she had already put one handcuff on me. Boykin radioed for staff assistance. . . . [Case Manager Wendel Locklear came in and] Almodovar stated to Wendel Locklear that I had showed her my penis, and I wouldn't submit to the other handcuff. Locklear looked at me, I looked at him, and shrugged my shoulders. . . . I turned around and it was Locklear who placed the other handcuff on.

(<u>Id.</u> at ¶ 37- ¶ 40.) Other officers then arrived and Defendant Bartee ordered them to take Plaintiff to solitary confinement. (<u>Id.</u> ¶¶ 42-43.) Plaintiff contends that no person made any comment about ejaculation or semen up to this point.

Plaintiff also makes entirely new revelations concerning his conversation with Defendant Britt. He claims that Defendant Britt asked him why Defendant Almodovar was so nervous and shaken, and Plaintiff responded that he should ask her. (<u>Id.</u> ¶ 47.) When Defendant Britt replied that he did and that she said Plaintiff showed her his penis, Plaintiff responded "'well there you go. It sounds like a sexual act to me. That's a B-6 infraction and a 'B' class punishment and I'll still be able to keep my medium custody.'" (<u>Id.</u>) Defendant Britt replied that Defendant Almodovar would not be so nervous over a prisoner showing her his penis and asked again what happened. (<u>Id.</u> ¶ 48.) After Plaintiff again told him to ask Defendant Almodovar, Defendant Britt allegedly became angry, told Plaintiff he would make sure the charge was an assault charge that would result in close custody, and tried to get Plaintiff to cooperate against Defendant Almodovar. (<u>Id.</u> ¶ 50.) When he refused, Defendant Britt then allegedly stated that if Plaintiff would not cooperate, Defendant Almodovar would if she wanted to keep her job and that he "would see this through even if it cost [him his] job." (<u>Id.</u> ¶ 52.) Later that same day, Defendant Almodovar gave her statement to local law enforcement. (<u>Id.</u> ¶ 54.)

Plaintiff was placed in a solitary cell for three days where he alleges he had no mattress, no clothes beyond his boxer shorts, no linens, no toilet tissue, no blanket, and no soap. (Id. ¶ 58.) According to Plaintiff these types of restrictions are imposed normally when misbehavior occurs in solitary confinement, not when it occurs in general population. (Id.)

Most of the rest of Plaintiff's Declaration follows more closely with the Complaint and Amended Complaint and details the prison disciplinary process, his attempts to preserve and receive the photographic and video evidence, and the criminal proceedings in state court. Therefore, the Court will not repeat it, but may note it below where necessary for the purposes of discussion.[3] A number of Defendants also submitted Declarations. For the most part they deny Plaintiff's allegations concerning false statements or the intentional hiding or destruction

---

[3] The Court does note that with respect to the alleged video evidence, it is undisputed that there is no video of the actual incident while Plaintiff was seated in Almodovar's office, because as Plaintiff notes in his Declaration, he was in a "blind spot" off camera. The video thus reflected only the period immediately before and after the incident. During the prison disciplinary proceedings, the video was viewed and a description of it was used in the written decision finding Plaintiff guilty of the disciplinary charges. That decision noted that the video did not show the actual incident, but only showed Plaintiff entering Defendant Almodovar's office, tampering with the front of his pants, and sitting in the blind spot of the camera. Later, Defendant Almodovar stood, ordered Plaintiff to submit to handcuffs, and handcuffed his left wrist before Plaintiff refused to let her handcuff the right. She continued to give orders to him before additional staff responded, finished handcuffing Plaintiff, and escorted him away. (1:17CV47, Respondent's Brief [Doc. #6], Ex. 1.) Defendant's assertions in his Declaration are now in agreement, specifically that he had "attempted to retrieve the video showing what little could be seen but was unable to do so; the server did not keep the video from that long ago," and in a subsequent interview Defendant Locklear said that the "video was no longer on the system, since the videos do not stay on the system permanently." (Record [Doc. #99-4] at 10-11.) As noted above, the criminal charges were dismissed because "[n]ecessary items of evidence were not preserved for trial by Scotland Correctional Institute." In her Declaration, Defendant Poole states that she believed the Administrative Captain may have preserved a copy of the video, but that person, who is not a Defendant, went on medical leave before retiring, and Defendants' later attempts to access the video on the former Administrative Captain's computer proved unsuccessful.

13

of evidence and are not needed to decide the pending motions. Where they are needed, the Court will discuss those Declarations at the appropriate points.

## II. Summary Judgment Motions

The primary motions before the Court are a Motion for Summary Judgment [Doc. #97] filed by Plaintiff and a competing Motion for Summary Judgment [Doc. #108] filed by a Defendants Bartee, Britt, Covington, Gerald, Hammonds, Lochlear, Locklear, McClean, Mewborn, Poole, and Wallace.

### A. Summary Judgment Standard

Summary judgment is appropriate when no genuine issue of material fact exists. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. Id. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. See, e.g., Shaw v.

Stroud, 13 F.3d 791, 798 (4th Cir. 1994); see also Anderson, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials.)

## B. Claims Related to Prison Discipline

Before addressing the specific claims raised against particular Defendants, the Court will first discuss Plaintiff's claims as they relate to his prison disciplinary process and/or the events surrounding it. As stated above, Plaintiff previously raised substantively similar claims in a habeas petition, which was denied on its merits. Undeterred by this fact, Plaintiff now seeks to bring similar claims in the present action by raising challenges that call his prison disciplinary convictions into question. This is not proper for several reasons. First, such claims are barred by the principle of collateral estoppel, which "'forecloses the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom [collateral estoppel] is asserted had a full and fair opportunity to litigate.'" In Re Microsoft Corp. Antitrust Litigation, 355 F.3d 322, 326 (4th Cir. 2004) (quoting Sedlack v. Braswell Servs. Group, Inc., 134 F.3d 219, 224 (4th Cir. 1998)).

Second, because Plaintiff's claims related to his disciplinary hearing necessarily call his disciplinary convictions into question and those convictions involved the loss of good time credits, Plaintiff must challenge them in a separate habeas proceeding under 28 U.S.C. § 2254, not in an action under § 1983. Preiser v. Rodriguez, 411 U.S. 475, 500 (1973) (discussing good time credits in the context of prison disciplinary proceedings); see also Wilkinson v. Dotson, 544 U.S. 74, 79 (2005) ("Because an action for restoration of good-time credits in effect demands immediate release or a shorter period of detention, it attacks 'the very duration of

15

physical confinement' and thus lies at 'the core of habeas corpus.'" (internal citations and ellipses omitted) (quoting Preiser, 411 U.S. at 487-88)). Additionally, the Court notes that any claims challenging those convictions at this point would not only constitute habeas claims, but those claims would amount to a second or successive habeas petition. If Plaintiff seeks to pursue such a petition, he must first apply to the United States Court of Appeals for the Fourth Circuit for an order authorizing this Court to consider the petition, as required by 28 U.S.C. § 2244(b)(3)(A). This Court cannot consider a successive petition unless that authorization first issues.

Finally, Plaintiff may not undermine his disciplinary convictions without first showing that such convictions were reversed on direct appeal, expunged by Executive Order, declared invalid by a state tribunal, or, finally, called into question by a federal court through the issuance of a writ of habeas corpus. See generally Heck v. Humphrey, 512 U.S. 477 (1994); see also Pierce v. Freeman, No. 95-7031, 1997 WL 467533, at *1-2 (4th Cir. Aug. 15, 1997) (unpublished) ("Neither can [a prisoner] proceed on [a] claim for monetary damages for the alleged deprivation of good-time credits without due process of law. . . . [Such] claims, if proven, would necessarily imply the invalidity of the revocation of [the] good time credits . . . and are consequently barred under the rule announced in Heck." (citing Edwards v. Balisok, 520 U.S. 641 (1997)) (internal citations omitted)). Plaintiff's disciplinary convictions are still valid and in place, therefore, claims challenging them are barred in the present action by Heck. For all of these related reasons, Plaintiff's claims regarding his prison disciplinary proceedings in the present action fail as to all Defendants and should be denied. The Court will not further discuss them in any detail.

16

C. "Deliberate Indifference," "Equal Protection," and PREA Claims under § 1983

Some of Plaintiff's claims quickly fail and bear little discussion. At various points, Plaintiff makes general claims based on "deliberate indifference" to his various rights. However, there is no separate claim for "deliberate indifference" under § 1983. Rather, deliberate indifference is the standard by which other types of claims, such as those based on a denial of proper medical treatment or the creation or ignoring of hazardous prison conditions, are judged. Therefore, the Court will not address Plaintiff's claims of "deliberate indifference" further except, as explained later, in conjunction with Defendant Britt and Plaintiff's housing immediately after the incident with Defendant Almodovar.

Plaintiff also raises an equal protection claim. Typically, equal protection claims involve allegations that defendants "treated [a plaintiff] differently because he is a member of a suspect class or because he exercised a fundamental right." Renchenski v. Williams, 622 F.3d 315, 337 (3d Cir. 2010). Plaintiff does not allege membership in a suspect class, but may attempt to raise a claim based on his filings of various grievances and legal actions. If so, he provides no actual evidence to support this allegation. In some circumstances, a party can base an equal protection claim on a "class-of-one" theory of liability by showing that he was "'intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment.'" Id. at 337-338 (quoting Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000)). However, courts "approach[] class-of-one claims with caution," particularly where a decision "involves a great deal of discretion," because of the danger of turning all government decisions into constitutional causes of action. Kansas Penn Gaming, LLC v. Collins, 656 F.3d 1210, 1216 (10th Cir. 2011). In other words, a "class-of-one equal protection

17

theory is a 'poor fit' where the challenged governmental action is the product of a broadly discretionary decision-making process." United States v. Moore, 543 F.3d 891, 900 (7th Cir. 2008). The decision by prison officials of whether or not to bring a prison disciplinary charge represents just such an action. In any event, Plaintiff points to no similarly situated individuals. He therefore establishes no claim based on an equal protection violation.

Plaintiff also attempts to raise a claim that no investigation was conducted under the PREA. However, the PREA does not create any individual cause of action and § 1983 cannot be used to create one. De'lonta v. Clarke, Civil No. 7:11-cv-00483, 2013 WL 209489, at *2-3 (W.D. Va. Jan. 14, 2013) (unpublished) (citing cases). Any attempted claim under that statute fails and should be dismissed.

### D. Access to Court Claims

Plaintiff raises claims based on Defendants generally depriving him of his constitutional right of access to the courts by not providing photographic and video evidence and by transferring him to a more distant prison while his state criminal charges remained pending. Plaintiff's Complaint, Amended Complaint, and pleadings are not entirely clear, but Plaintiff appears to possibly raise these claims in conjunction with his prison disciplinary hearings, his ability to defend his state court criminal charges, his earlier habeas action in this Court, and perhaps other litigation. As for any claim related to the prison disciplinary charges, that claim cannot proceed for the reasons already set out. As for any other access to courts claims, Plaintiff must show that Defendants' actions actually deprived him of the ability to pursue nonfrivolous post-conviction or civil rights claims. See Jackson v. Wiley, 352 F. Supp. 2d 666, 679-80 (E.D. Va.) (citing Lewis v. Casey, 518 U.S. 343 354-55 (1996)), aff'd, 103 F. App'x 505

(4th Cir. 2004). Plaintiff cannot show any deprivation regarding the state court criminal charges because he actually prevailed on those charges. He did not prevail on his previous habeas action. However, he cannot use the current action to relitigate that matter and, in any event, did not lose because of any of the actions by Defendants alleged in the present case, but because he could not meet the very narrow standards for challenging a prison disciplinary action in a federal habeas proceeding. Clark v. Hooks, No. 1:17CV47 (M.D.N.C. Aug. 9, 2017), recommendation adopted, Order and Judgment (M.D.N.C. Sept. 20, 2017). Plaintiff did not appeal that decision. As for any other litigation, Plaintiff fails to set out sufficient facts to state any claim for relief. Therefore, his denial access to the courts claims fail and should be denied.

### E. Remaining Federal Claims Under § 1983

The Court will now turn its attention to Plaintiff's remaining federal claims brought under § 1983 as they relate to particular Defendants.

#### 1. Defendant Shawn Lindsey Britt

Plaintiff makes multiple allegations concerning Defendant Britt. Several of these appear to be based on matters related to his prison disciplinary conviction, access to court arguments, and general disregard of his rights. Any such claims fail as just discussed. However, he also appears to raise other claims as to Defendant Britt. One is that Britt retaliated against him based on prior litigation filed by Plaintiff under § 1983 in the United States District Court for the Eastern District of North Carolina after Plaintiff successfully fought a disciplinary conviction for assault at Bertie Correctional Institution. "A plaintiff alleging that government officials retaliated against [him] in violation of [his] constitutional

19

rights must demonstrate, *inter alia*, that [he] suffered some adversity in response to [his] exercise of protected rights." American Civil Liberties Untion of Maryland, Inc. v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993) (citing Huang v. Board of Governors of University of North Carolina, 902 F.2d 1134, 1140 (4th Cir.1990)). "Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim." Id. Here, the clearest potential impairment of Plaintiff's rights is the theory behind his access to the courts claims. However, he failed to establish those claims. Further, even Plaintiff's own evidence attributes a different motive for Defendant Britt's alleged actions. According to Plaintiff's Declaration, Defendant Britt became enraged with him due to a combination of Defendant Almodovar telling Defendant Britt that Plaintiff exposed himself to her, Plaintiff having engaged in similar misconduct on prior occasions, and Plaintiff defying Defendant Britt by stating that he did not care about another charge for committing a sexual act and that he could beat a more serious assault charge the way he did at Bertie Correctional. (Plaintiff's Declaration, ¶¶ 47-52.) Thus, it was Plaintiff, not Defendant Britt, who first referenced the incident at Bertie Correctional. Nothing in Plaintiff's evidence indicates that Defendant Britt previously knew about this incident or about any litigation filed because of it. In the end, Plaintiff provides only allegations and no actual evidence that Defendant Britt acted as alleged due to any retaliation based on Plaintiff's exercise of constitutionally protected rights.

Plaintiff next claims that Defendant Britt combined with Defendant Almodovar to criminally prosecute him in the state courts. Strictly speaking, a "malicious prosecution" claim does not exist under § 1983, but an analogous claim arises under the Fourth Amendment of

20

the United States Constitution. Snider v. Seung Lee, 584 F.3d 193, 199 (4th Cir. 2009).

Plaintiff cited the Fourth Amendment in his pleadings. To establish such a claim, Plaintiff

must produce evidence that Defendant Britt continued to prosecute him after he knew or

should have known of his innocence and show that the charges against him terminated in his

favor. Miller v. Prince George's Cnty., Md, 475 F.3d 621, 627 (4th Cir. 2007); Brooks v. City

of Winston Salem, 85 F.3d 178, 181-84 (4th Cir. 1996). Here, according to the undisputed

facts in the record, Defendant Almodovar, not Defendant Britt, was the complaining witness

who sought a warrant for Plaintiff's arrest on criminal charges. In the records of the state

criminal proceedings submitted by Plaintiff, it is clear that the criminal proceeding began when

"Deputy Jessica Friede was contacted by Monica Rose Almodovar in reference to a report of

an assault that occurred at the prison." (Record [Doc. #99-4] at 69.) Defendant Britt gave

statements during the prison disciplinary process, but not during the criminal prosecution in

the state courts. Further, although statements he made during the disciplinary process may

have been passed to the prosecuting authorities at some point during the prosecution, this

does not somehow turn Defendant Britt into a complaining witness. He did not initiate or

control the criminal prosecution and did not even make a direct statement to state authorities

regarding the events that occurred on June 14, 2016. Plaintiff attempts to base a malicious

prosecution claim against Defendant Britt by claiming in his Declaration that Defendant Britt

coerced Defendant Almodovar and even threatened her job if she did not cooperate by

claiming that Plaintiff assaulted her. However, even in Plaintiff's latest rendition of the events,

Defendant Britt's comments concerned only the prison disciplinary process. There is no

evidence that Defendant Britt ever threatened to have Plaintiff prosecuted criminally.

Plaintiff's claim against Defendant Britt for malicious prosecution fails for these reasons.

Finally, Plaintiff may be attempting to allege that he was subjected to cruel and unusual punishment during the three days following his misconduct in Defendant Almodovar's office. Plaintiff must meet very high standards for cruel and unusual punishment because:

> [i]n order to establish that [he] has been subjected to cruel and unusual punishment, a prisoner must prove (1) that "the deprivation of [a] basic human need was objectively 'sufficiently serious,' " and (2) that " subjectively 'the officials act[ed] with a sufficiently culpable state of mind.' " Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir.1993) (second alteration in original) (quoting Wilson [v. Seiter], 501 U.S. [294] at 298, 111 S.Ct. 2321 [(1991)]). Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement. See Hudson [v. McMillian], 503 U.S. [1] at 8-9, 112 S.Ct. 995 [(1992)]. In order to demonstrate such an extreme deprivation, a prisoner must allege "a serious or significant physical or emotional injury resulting from the challenged conditions," Strickler, 989 F.2d at 1381, or demonstrate a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions, see Helling [v. McKinney], 509 U.S. [25] at 33-35, 113 S.Ct. 2475 [(1993)]. The subjective component of an Eighth Amendment claim challenging the conditions of confinement is satisfied by a showing of deliberate indifference by prison officials. See Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[D]eliberate indifference entails something more than mere negligence ... [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. at 835, 114 S.Ct. 1970. It requires that a prison official actually know of and disregard an objectively serious condition, medical need, or risk of harm. See id. at 837, 114 S.Ct. 1970; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir.1995).

De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). Here, Plaintiff alleges that Defendant Britt subjected him to very unpleasant conditions in the three days after he exposed himself to Defendant Almodovar. However, Plaintiff also acknowledges that these conditions are not unknown in solitary confinement at the prison where he is housed. (Plaintiff's Declaration ¶ 59.) According to him, they typically apply where misbehavior occurs by a

prisoner already housed in solitary confinement and not by one who misbehaves while in general population. (Id.) However, this fact does not somehow transform a set of conditions that does not meet the standards for cruel and unusual punishment into one that does. In fact, Plaintiff being subjected to such conditions is entirely understandable given his extensive and repeated history of engaging in exactly the sort of offensive and prohibited behavior that led to him being housed in solitary confinement on this occasion. The parties disagree over the exact nature of what occurred in Defendant Almodovar's office, but even in Plaintiff's version of events he engaged in lewd behavior, exposed himself to Defendant Almodovar for sexual gratification, and did not immediately cooperate when ordered to submit to handcuffs. Finally, Defendant does not allege any serious or significant injury from his treatment during the three days in question. In fact, he alleges no injury at all other than stress when his mother drove to see him and was unable to do so. This is not sufficient to support a claim for relief. Defendant Britt's Motion seeking summary judgment should be granted.

## 2. Defendant Katy Poole

Plaintiff also raises allegations against Defendant Katy Poole, the warden of Scotland Correctional. Plaintiff contends that Defendant Poole did not provide video and photographic evidence to the Scotland County Sheriff's office or the district attorney and that this evidence would have proved Plaintiff's innocence of the criminal charges. Plaintiff was never convicted of those charges. Therefore, providing the evidence, whatever the nature of that evidence, would not have resulted in any different outcome as to the criminal charges. Plaintiff contends that the evidence was important because the dropping of the charges based on a lack of evidence did not result in his full exoneration. He contends that this left him with

23

a damaged reputation as someone who assaulted Defendant Almodovar by ejaculating in her office and on her hand. Given Plaintiff's extensive history of sexual misconduct in prison, assaultive or uncooperative behavior toward staff, and admittedly defiant statement to Defendant Britt that one more prison disciplinary write up for sexual activity did not bother him, his current claim regarding his tarnished reputation among prisoners and staff is frivolous. Regardless, even if the evidence supported him in the way that he contends, the criminal charges would never have proceeded to trial. They would have been dismissed in any event just as they ultimately were. Therefore, any failure to produce evidence had no effect on Plaintiff and did not harm him in any way, much less violate his federal constitutional rights. Summary judgment should also be granted in Defendant Poole's favor.

3. Defendants Pamela J. Locklear and Queen Gerald

Plaintiff's only allegations against Defendant Locklear involve her handling of his prison disciplinary hearing. As just set out, he cannot bring those claims. Therefore, the claims against her should be denied and she should be dismissed from the case. Similarly, Plaintiff's main allegations as to Defendant Gerald are that she participated in the prison disciplinary process and these allegations also fail. Plaintiff does make an allegation that she supervised Defendant Almodovar and the unit where the incident occurred. However, Defendant Gerald's status as a supervisor does not subject her to liability under § 1983 because theories of *respondeat superior* or predicated solely on a defendant's identity as a supervisor do not exist under § 1983. Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009). The Court should grant summary judgment in Defendant Locklear and Defendant Gerald's favor and dismiss them from the case.

4. Defendants Jamie Hammonds, Selena Bartee, Dean Lochlear, and Ronald Covington

The next two Defendants for discussion are Jamie Hammonds and Selena Bartee. As to Defendant Hammonds, Plaintiff alleges that he conducted or assisted in the investigation of the incident with Defendant Almodovar and that he was one of her supervisors. Plaintiff makes those same allegations as to Defendant Bartee, but also alleges that she told officers to take Plaintiff to solitary confinement following the incident. As already stated, Plaintiff cannot base any allegation on these Defendants' status as supervisors. He also cannot pursue a claim based on their handling of the investigation because he is not constitutionally entitled to an investigation conducted in a particular manner or to his liking. In fact, he had no constitutional right to an investigation at all. Vinyard v. Wilson, 311 F.3d 1340, 1356 (11th Cir. 2002); Gomez v. Whitney, 757 F.2d 1005, 1006 (9th Cir.1985); see also Day v. Idaho Dep't of Corr., No. 99-35427, 1999 WL 1269339 (9th Cir. Dec. 27, 1999) (unpublished) (applying Gomez in prison setting). As for Defendant Bartee ordering officers to take Plaintiff to solitary confinement, this could not possibly have violated his federal constitutional rights. The uncontested facts are that she did so after being informed, at the very least, that Plaintiff exposed himself to Defendant Almodovar and refused an order to submit to handcuffs. After previously denying engaging in these forms of conduct, Plaintiff now admits to them in his Declaration. Defendant Bartee's actions were in no way improper and any contention otherwise is utterly frivolous. Summary judgment should be granted to Defendants Hammonds and Bartee and they should be dismissed from the case.

As for Defendants Lochlear and Covington, Plaintiff claims that they signed off on an investigation report that did not include all of the potential evidence in the case, particularly

the photographs and video evidence in the case. Again, Plaintiff is not constitutionally entitled to an investigation conducted to his satisfaction. In any event, the lack of evidence eventually led to the criminal charges against him being dropped. Therefore, he suffered no harm from the omission of these items. Plaintiff makes an additional allegation that Defendant Lochlear made "false" statements to the district attorney handling the criminal case. (Plaintiff's Declaration, ¶¶ 91-92.) These allegedly false statements involved what became of certain physical evidence from the incident, which pictures were taken, and who escorted Plaintiff to solitary confinement. It is unclear whether these alleged misstatements, if they were such, could have been a product of an innocent mistake on Defendant Lochlear's part rather than intentional misstatements. However, this question need not be resolved because, again, the charges against Plaintiff were dropped and the alleged misstatements caused Plaintiff no harm.

Plaintiff also makes what may be an additional allegation or attempt at a claim against Defendant Covington. He contends that Defendant Covington sent Plaintiff's mother home when she showed up for a scheduled visit that staff failed to cancel while he remained in solitary confinement after the incident with Defendant Almodovar, and that Defendant Covington, when Plaintiff was escorted from the prison, made sarcastic comments about Plaintiff being spiteful and malicious and informed him that he had messed with the wrong staff. None of these allegations states any claim for relief. Plaintiff cannot raise a claim based on inconvenience to his mother because he cannot raise a claim on behalf of others. As for any comments, § 1983 is not a civility statute. Even "threats or verbal abuse, without more, do not state a cognizable claim under § 1983." Wilson v. McKeller, 254 F. App'x. 960, 961 (4th Cir. 2007) (citing cases). Plaintiff's allegations against Defendant Covington do not rise

even to that level. The Court should grant both Defendant Lochlear and Defendant Covington's Motions for Summary Judgment.

### 5. Defendants Reginald R. Mewborn and Elizabeth D. Wallace

Plaintiff claims that Defendants Mewborn and Wallace mishandled prison grievances by ruling against Plaintiff when handling those grievances. These allegations do not state any viable claim for relief. Prisoners have no right to a grievance process at all and no right to substantive due process in the handling of grievances. Grieveson v. Anderson, 538 F.3d 763, 772 n.3 (7th Cir. 2008) (no substantive right to a grievance procedure); Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) (no right to any grievance procedure or to access any procedure voluntarily created by the State). Therefore, Plaintiff's claims fail against these Defendants fail and the Court should grant Defendant Mewborn and Defendant Wallace's Motion for Summary Judgment.

### 6. Defendant Zerranti McClean

Plaintiff alleges that Defendant McClean took pictures of him on Defendant Britt's orders following the incident in Defendant Almodovar's office, that he knew the pictures contained no incriminating evidence against Plaintiff, and that he has not spoken out in Plaintiff's defense. These allegations state no claim for relief, as Plaintiff has no right not to have his picture taken or to have Defendant McClean speak out on his behalf. Plaintiff does not make an allegation that Defendant McClean somehow destroyed the pictures after taking them, but may attempt to include him in some type of overall conspiracy with other Defendants. If so, this fails because the allegations are entirely conclusory and without any

27

actual evidentiary support. The Court should grant summary judgment in Defendant McClean's favor.

### F. State Law Claims

In addition to the federal claims discussed above, Plaintiff also seeks to raise claims based on North Carolina law for malicious prosecution, obstruction of justice, intentional infliction of emotional distress, and violations of N.C Gen. Stat. § 15A-268(a1), (a5), and (a7)(i).

Under North Carolina law, the elements for a claim of malicious prosecution are similar to those discussed above in conjunction with Plaintiff's § 1983 claims. "To establish malicious prosecution, a plaintiff must show that the defendant (1) initiated or participated in the earlier proceeding, (2) did so maliciously, (3) without probable cause, and (4) the earlier proceeding ended in favor of the plaintiff." Turner v. Thomas, 369 N.C. 419, 425, 794 S.E.2d 439, 444 (2016) (citing N.C. Farm Bureau Mut. Ins. Co. v. Cully's Motorcross Park, Inc., 366 N.C. 505, 512, 742 S.E.2d 781, 786 (2013)). Further, the North Carolina Supreme Court has stated that "Where the claim is one for malicious prosecution, [p]robable cause ... has been properly defined as the existence of such facts and circumstances, known to [the defendant] at the time, as would induce a reasonable man to commence a prosecution. We have consistently held that whether or not probable cause exists is determined at the time prosecution begins." Id. (internal citations and quotations omitted). Here, as discussed above, only Defendant Almodovar initiated or participated in the state criminal prosecution at the time it began. Any involvement by other Defendants was tangential and came after the prosecution began.

Therefore, Plaintiff cannot maintain a malicious prosecution claim against those Defendants and they are entitled to summary judgment on this claim.

As for Plaintiff's obstruction of justice claim, North Carolina is one of the few states that allows a civil action based on obstruction of justice. However, that cause of action is also limited in nature. It does not apply to conduct that a defendant engages in during the course of a criminal investigation, as is alleged here, but instead covers conduct obstructing civil claims. Braswell v. Medina, 255 N.C. App. 217, 234, 805 S.E.2d 498, 510 (2017). Therefore, Defendants should also be granted summary judgment on this claim.

Plaintiff's claim for intentional infliction of emotional distress fails as well. "The essential elements of an action for intentional infliction of emotional distress are 1) extreme and outrageous conduct by the defendant 2) which is intended to and does in fact cause 3) severe emotional distress.'" Rouse v. Duke University, 869 F. Supp. 2d 674, 681 (M.D.N.C. 2012) (quoting Waddle v. Sparks, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992)). "To be extreme and outrageous, conduct must 'go beyond all possible bounds of decency, and . . . be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Briggs v. Rosenthal, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311 (1985)). Mere upset or disappointment is not sufficient. Instead, "[t]he term 'severe emotional distress' means 'an emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.'" Riddle v. Buncombe County Board of Education, 805 S.E.2d 757, 760 (N.C. App. 2017) (quoting Sorrells v. M.Y.B. Hosp. Ventures of Asheville, 334 N.C. 669, 672, 435 S.E.2d 320, 322 (1993)). Here, Plaintiff does not even

make a factual allegation satisfying the standard for severe emotional distress, much less provide evidence of such distress. Defendants' Motion for Summary Judgment should be granted as to this claim as well.

Finally, Plaintiff points to alleged violations by Defendants of N.C Gen. Stat. § 15A-268(a1), (a5), and (a7)(i), which is a statute dealing with the preservation of biological evidence. This statute is a criminal statute. Plaintiff cannot enforce a state criminal statute in this Court or raise a claim based upon it. This claim should be dismissed.

## III. Defendant Almodovar

The last Defendant named by Plaintiff and served is Defendant Almodovar. It appears from the docket sheet that the summons was delivered to her house by the United States Marshals Service and that a person listed as her husband signed for the summons. (See USMS Return [Doc. #66].) However, neither she nor an attorney on her behalf has filed an answer or otherwise appeared before the Court in this matter. Based on the lack of an answer, Plaintiff filed a Motion [Doc. #86] seeking a default judgment and a second motion seeking "Default Summary Judgment" [Doc. #100] as to Defendant Almodovar.

Upon review of those Motions and the claims against Defendant Almodovar in light of the evidence discussed above, the Court concludes that many of the claims against Defendant Almodovar should be dismissed even without a response. In this regard, the Court notes that Plaintiff is proceeding *in forma pauperis* in this matter. "The federal *in forma pauperis statute*, first enacted in 1892 [and now codified at 28 U.S.C. § 1915], is intended to guarantee that no citizen shall be denied access to the courts 'solely because his poverty makes it impossible for him to pay or secure the costs.'" Nasim v. Warden, Md. House of Corr., 64

F.3d 951, 953 (4th Cir. 1995) (en banc) (quoting <u>Adkins v. E.I. DuPont de Nemours & Co.</u>, 335 U.S. 331, 342 (1948)). "Dispensing with filing fees, however, [is] not without its problems. Parties proceeding under the statute d[o] not face the same financial constraints as ordinary litigants. In particular, litigants suing in forma pauperis d[o] not need to balance the prospects of successfully obtaining relief against the administrative costs of bringing suit." <u>Nagy v. Federal Med. Ctr. Butner,</u> 376 F.3d 252, 255 (4th Cir. 2004). To address this concern, the *in forma pauperis* statute provides that "the court shall dismiss the case *at any time* if the court determines that – . . . (B) the action or appeal – (I) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) (emphasis added).

Judged by the standards just set out, many of the claims Plaintiff potentially raises against Defendant Almodovar fail for the same reasons as they failed against other Defendants. This is true for any claims related to prison disciplinary proceedings, the grievance process, general claims of "deliberate indifference," access to courts claims, and state law claims for obstruction of justice and intentional infliction of emotional distress.

However, the malicious prosecution claims under § 1983 and under state law raise additional issues and contentions beyond the matters addressed above. If Defendant Almodovar had answered and filed a motion for summary judgment, it is possible that those claims would also be subject to dismissal. However, Defendant Almodovar has elected not to respond. The Court could appoint her pro bono counsel and give her additional time to respond and address the claims. However, she indicated to the state prosecutors that she wanted to move on and put this whole incident behind her, and it may be that she likewise

prefers not to respond to the present allegations. Because she has not responded, though, Federal Rules of Civil Procedure 55(a) would call for entry of default. The entry of default is a procedural prerequisite to a default judgment, and Rule 55(a) states that the clerk must enter default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." The Court will therefore construe Plaintiff's first Motion for Default Judgment as a request for entry of default and will grant that request and will direct the clerk to enter default and provide notice of that action to Defendant Almodovar at her most-recently available address [Doc. #50], so that she has the opportunity to move to set aside the default and request pro bono counsel if she wants to answer and defend in this case.

Further, the Court notes that if default judgment is ordered, the question of damages may be considered by the Court. Specifically, under Federal Rule of Civil Procedure 55(b)(2),

> The court may conduct hearings or make referrals – preserving any federal statutory right to a jury trial – when, to enter or effectuate judgment, it needs to:
> (A)    conduct an accounting;
> (B)    determine the amount of damages;
> (C)    establish the truth of any allegation by evidence; or
> (D)    investigate any other matter.

Regarding the issue of damages, "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P 54(c). Thus, the type and amount of damages in a default judgment is limited to the amount and type of damages pled in the Complaint, which operates as a ceiling on the damages the Court can award in its discretion. Educational Credit Management Corp. v. Optimum Welding, 285 F.R.D. 371, 373 (D. Md. 2012). In determining the appropriate amount of damages, the Court may hold a

32

hearing or instead rely on "'detailed affidavits or documentary evidence to determine the appropriate sum.'" Id. (quoting Adkins v. Teseo, 180 F. Supp. 2d 15, 17 (D.D.C.2001)). As noted by another district court in this circuit:

> [T]he overwhelming weight of authority instructs that the Seventh Amendment does not guarantee a jury trial after default. See Graham [v. Malone Freight Lines, Inc., 314 F.3d 7, 9, 12, 16 (1st Cir. 1999)] (holding plaintiff had no right to jury trial after defendant's default); Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc., 982 F.2d 686, 692 n.15 (1st Cir. 1993) (citing Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1414 (9th Cir. 1990)); Matter of Dierschke, 975 F.2d 181, 185 (5th Cir. 1992) ("[I]n a default case neither the plaintiff nor the defendant has a constitutional right to a jury trial on the issue of damages"); Henry v. Sneiders, 490 F.2d 315, 318 (9th Cir. 1974); Olcott v. Del. Flood Co., 327 F.3d 1115, 1124 (10th Cir. 2003); Mwani v. Bin Ladin, 244 F.R.D. 20, 23–24 (D.D.C. 2007) (denying plaintiff's motion for jury trial after default); Benz v. Skiba, Skiba & Glomski, 164 F.R.D. 115, 116 (D. Me. 1995) (rejecting plaintiff's request for jury trial because "[c]aselaw dating back to the eighteenth century ... makes clear that the constitutional right to jury trial does not survive the entry of default"); CountrymAn Nevada, LLC. v. Suarez, No. 6:15-CV-0436-SI, 2016 WL 5329597, at *4–5 (D. Or. Sept. 22, 2016) (overruling plaintiff's request for jury trial after default); Sonoco Prod. Co. v. Guven, No. 4:12-CV-00790-BHH, 2015 WL 127990, at *7 n.5 (D.S.C. Jan. 8, 2015) (holding that "parties do not have the right to a jury trial as to the amount of recovery" after default judgment is entered); Estate of Faull v. McAfee, No. 613CV1746ORL31KRS, 2015 WL 6125309, at *4 (M.D. Fla. Oct. 16, 2015) (ruling plaintiff was not entitled to jury trial after defendant's default). Wright and Miller also agree that, after default, "neither side has a right to a jury trial on damages." 10A Fed. Prac. & Proc. Civ. § 2688 (4th ed.).
> . . . .
> [Moreover,] "[d]espite the reference to a 'federal statutory right to a jury trial,' courts have interpreted the language of Rule 55 as preserving a right to a jury trial only in the atypical situation where a statute specifically preserves the jury trial right even after a default." Manno v. Tennessee Prod. Ctr., Inc., 657 F. Supp. 2d 425, 429–30 (S.D.N.Y. 2009). That is, the statute must protect the right in the specific context of default; the only statute to do so—28 U.S.C. § 1874—is not implicated here. See Sells v. Berry, 24 Fed.Appx. 568, 572 (7th Cir. 2001); Meyers v. Lakeland Supply, Inc., 133 F. Supp. 2d 1118, 1119 (E.D. Wis. 2001) (holding that, even where statute provided general jury trial right, it failed to provide one in case of default); Benz, 164 F.R.D. at 115–16 (protection in Rule 55(b)(2) only "applies to statutes requiring jury trials specifically after default has occurred"); Shepherd, 862 F. Supp. at 492 n.4; Offei v. Omar, No. 11 CIV. 4283 SAS MHD, 2011 WL 4448954, at *1 (S.D.N.Y. Sept. 20, 2011);

33

Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2688 (Rule 55(b)(2) "provides that the court must preserve any federal statutory right of trial by jury. The only relevant statute is Section 1874 of Title 28").

Armeni v. Transunion LLC, Inc., 2016 WL 70468349 (W.D. Va. Dec. 2, 2016).

In this case, there is no need for a jury trial to determine damages on the default judgment. The Prison Litigation Reform Act, as relevant here, states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 28 U.S.C. § 1997e(e). Thus, while nominal damages are recoverable for a constitutional violation, Plaintiff may not recover damages on his § 1983 claim for mental or emotional injury without a showing of physical injury. Moreover, even if Plaintiff could show a physical injury for purposes of § 1997e(e), absent proof of actual injury or compensatory damages, the court is limited to awarding plaintiff nominal damages. See Farrar v. Hobby, 506 U.S. 103, 112 (1992); Williams v. Griffin, 952 F.2d 820, 825 n.2 (4th Cir.1991). Here, Plaintiff in the Amended Complaint seeks "[c]ompensatory and punitive monetary damage relief of $200,000, jointly and severally from defendants [as well as] other relief [the] court deems just and proper." (Amended Complaint, § VII.) Plaintiff produces nothing to justify such an award or an amount remotely close to it. Of the many claims Plaintiff raises, only the malicious prosecution claims against Defendant Almodovar are part of the default judgment. Plaintiff cannot seek any damages related to his prison disciplinary conviction even as to that claim, because the prison disciplinary conviction is not subject to challenge here, as discussed at length above. Thus, all damages must be related to the dismissed criminal charges in Scotland County. Plaintiff was never convicted of, incarcerated for any additional time on, or even

34

forced to trial on those charges. He reports no actual monetary loss, only mental or emotional suffering due to the possibility he would have had additional time added to his already lengthy sentence if he were convicted, and possible harm to his reputation. As already stated, this latter contention is frivolous. Plaintiff has spent his years in prison creating and firmly establishing his reputation as one who defies authority, willingly accepts or ignores punishment, and exposes himself or worse to female staff members. The dismissed criminal charges in the present case did not create that reputation and, in fact, could not even have worsened it given Plaintiff's long and repeated history of similar conduct. For these reasons, the record before the Court does not support recommending an award of more than nominal damages in the sum of $1.00.

Moreover, Plaintiff has not shown any basis for an award of punitive damages. Punitive damages are available in an action under § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). Punitive damages are discretionary, and are awarded "to punish the defendant for his outrageous conduct and to deter him and others like him from similar conduct in the future." Id. at 54 (alterations omitted). The Court may consider the damage that actually occurred as a result of the defendant's behavior, the damage that could have occurred, and the need to deter future similar conduct. TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 459-460 (1993). As already noted, no actual damage occurred to Plaintiff. Further, although extra incarceration could have resulted from the criminal charges brought by Defendant Almodovar, no such conviction or extra incarceration materialized. As a result of

Defendant Almodovar's statement, Plaintiff faced charges of malicious conduct by a prisoner due to throwing of a bodily liquid, assault on a female, and indecent exposure. However, Defendant himself created the situation that led to those charges. As Plaintiff notes, he is a very large male prisoner who was in a very small and confined space with Defendant Almodovar, who is much smaller than Plaintiff. While in that space, he intentionally exposed himself to her for the purposes of sexual gratification and subsequently refused her orders to submit to handcuffs, under his own version of events. Therefore, his admitted conduct at least arguably subjected him to the latter two charges that he faced. At the very least, a person in Defendant Almodovar's place could have believed this to be so. The only real dispute is whether Defendant ejaculated, which would support the malicious conduct charge. It is not clear how much time this charge could have added to his sentence versus the other two charges. However, in any event, Defendant Almodovar is no longer employed in the North Carolina Prison System, and any possible similar future incidents with other prison officials depends largely on Plaintiff and whether or not he continues to engage in sexual misconduct toward prison employees. If he ceases committing prison infractions for his own sexual gratification, the possibility of future false charges appears to practically nonexistent. For all of these reasons, the Court will not recommend any award of punitive damage, but only the entry of a default judgment in the amount of $1.00 based on nominal damages.

Therefore, if Defendant Almodovar does not move to set aside the default and for appointment of pro bono counsel, or otherwise object this Order and Recommendation, the Court recommends that Plaintiff's second Motion for Default Judgment be granted with an award to Plaintiff of nominal damages of $1.00 and no punitive damages.

IV. Unserved Defendants

Although summonses were twice issued for Defendants Toya Collins and Justin Chavis, the summonses were returned unexecuted and those Defendants remain unserved. The Court could consider allowing a further attempt at service as to these Defendants. However, Plaintiff's allegations against them are that they conducted or participated in the prison investigation that led to his disciplinary charges. These claims fail for the reasons already set out in conjunction with other Defendants. Therefore, they should be dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2).

V. Summary and Other Pending Motions

Summing up the case to this point based on the foregoing discussion, Defendants' Motion for Summary Judgment should be granted, Plaintiff's Motion for Summary Judgment should be denied, Plaintiff's Motions for Default Judgment will be treated as a request for an entry of default and will be granted, and if Defendant Almodovar does not move to set aside the default and for appointment of pro bono counsel, or otherwise object this Order and Recommendation, Plaintiff's second Motion for Default Judgment should be granted with an award to Plaintiff of nominal damages of $1.00 and no punitive damages. However, several other motions filed by Plaintiff also remain pending on the docket.

The first is a Motion [Doc. #102] by Plaintiff to subpoena the North Carolina Commissioner of Prisons for production of the video used in Plaintiff's prison disciplinary hearing and any documents related to the retention or destruction of that video. As already explained, Plaintiff cannot raise any claim related to his prison disciplinary hearing in this action. Therefore, this request for further discovery will be denied.

The second Motion [Doc. #103] asks the Court to exercise supplemental jurisdiction over Plaintiff's state law obstruction of justice claims. This Court has jurisdiction in this case in light of the federal claims, with supplemental jurisdiction over the state law claims. Plaintiff's Motion to Exercise Jurisdiction will therefore be granted to the extent that all of the claims have been addressed.

The next remaining Motion [Doc. #112] asks the Court to sanction Defendants for allegedly misrepresenting facts related to the existence or destruction of the video evidence and for allegedly failing to timely supplement responses to Plaintiff's interrogatories. Having reviewed that Motion, it is really just a further rehash of issues previously discussed regarding the video, with Plaintiff claiming that the video still exists and that Defendants hid and continue to hide that video. These are nothing more than points of disagreement in this lawsuit, not grounds for sanctions and the Motion will be denied accordingly.

The next motion filed by Plaintiff is a Motion for Appropriate Relief [Doc. #118] in which he alleges that he was not properly served with Defendants' Motion for Summary Judgment. On the same day, he also filed a thirty-six page Response [Doc. #120] to the Motion for Summary Judgment, along with exhibits and a Motion [Doc. #119] seeking to exceed the Court's ordinary page limits in filing his Response. The Court will grant the Motion to exceed the page limits and accept Plaintiff's full Response, but deny the Motion for Appropriate relief given that Plaintiff clearly received Defendants' Motion for Summary Judgment in a sufficient to formulate a full and lengthy Response to it.

Finally, Plaintiff filed a Motion for a Temporary Restraining Order and Preliminary Injunction [Doc. #123] in which he brings allegations of ongoing disputes and issues with

various Defendants. He essentially seeks to have them barred from disciplining him or being involved in any disciplinary action against him. This is not appropriate in light of the recommended dismissal of this action. The Court should deny the Motion for a Temporary Restraining Order and Preliminary Injunction.

Accordingly,

IT IS THEREFORE ORDERED that Plaintiff's Motion [Doc. #119] seeking leave to file a Response brief in excess of the Court's page limits is granted, Plaintiff's Motion to Exercise Jurisdiction [Doc. #103] is granted to the extent that all of the claims have been addressed, and Plaintiff's Motion for Leave to Subpoena North Carolina's Commissioner of Prisons [Doc. #102], Motion [Doc. #112] seeking sanctions, and Motion for Appropriate Relief [Doc. #118] are denied.

IT IS RECOMMENDED that Plaintiff's Motion for Summary Judgment [Doc. #97] be denied, that the Motion for Summary Judgment [Doc. #108] filed by a Defendants Bartee, Britt, Covington, Gerald, Hammonds, Lochlear, Locklear, McClean, Mewborn, Poole, and Wallace be granted, and that the action be dismissed as to these Defendants.

IT IS FURTHER RECOMMENDED that Plaintiff's claims against Defendants Almodovar, Collins, and Chavis be dismissed pursuant to 28 U.S.C. § 1915(e)(2) for failing to state a claim upon which relief may be granted except for the remaining claims as to Defendant Almodovar alleging malicious prosecution under state and federal law.

IT IS ORDERED that Plaintiff's Motion for Default Judgment [Doc. #86] is treated as a Motion for Entry of Default and granted as to those remaining claims against Defendant Almodovar in light of her failure to respond, and that the Clerk enter default and provide notice to Defendant Almodovar.

IT IS RECOMMENDED that if Defendant Almodovar does not move to set aside the default and for appointment of pro bono counsel, or otherwise object this Order and Recommendation by April 15, 2021, that Plaintiff's second Motion for Default Summary Judgment [Doc. #100] be granted with an award to Plaintiff of nominal damages of $1.00 and no punitive damages.

IT IS FURTHER RECOMMENDED that the Motion for Temporary Restraining Order and Preliminary Injunction [Doc. #123] be denied.

FINALLY, IT IS ORDERED that this case is STAYED until April 15, 2021, in light of the Covid-19 pandemic and related lock-downs and restrictions at state correctional facilities, in order to allow Defendant sufficient time to receive the Recommendation and present objections. Objections must be filed by April 15, 2021.

This, the 22nd day of February, 2021.

_____/s/ Joi Elizabeth Peake_____
United States Magistrate Judge